1

2

3

4

5

6                      IN THE UNITED STATES DISTRICT COURT

7

8                     FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

**United States District Court**
For the Northern District of California

10   KIMBERLY MARIE CURIEL, FREDERICK          No. C 06-05751 WHA
     MICHAEL CURIEL, M. T. C., a minor, by and
11   through her guardian ad litem Kimberly Marie
     Curiel, T. A. C., a minor, by an through her
12   guardian ad litem Kimberly Marie Curiel, J. M.   **ORDER GRANTING IN PART**
     C., a minor, by and through her guardian ad litem  **AND DENYING IN PART**
13   Kimberly Marie Curiel, HAZEL ANNE          **DEFENDANTS' MOTION FOR**
     McCLURE, MICHAEL JASON SIKKEMA, D.        **SUMMARY JUDGMENT**
14   A. M. S., a minor, by and through his guardian ad
     litem Hazel Anne McClure, C. R. M. S., a minor,
15   by and through her guardian ad litem Kimberly
     Marie Curiel,
16

17               Plaintiffs,

18        v.

19   THE COUNTY OF CONTRA COSTA,
     CONTRA COSTA COUNTY SHERIFF'S
20   DEPARTMENT SERGEANTS J. MAHONEY
     and K. DALY, sued in their individual capacities
21   and as employees of Contra Costa County,
     CONTR COSTA COUNTY SHERIFF'S
22   DEPARTMENT DETECTIVES JASON
     BARNES, SHAWN PATE, CLARK CARY
23   GOLBERG, MOORE, UYEDA, AND VAN
     ZELF, sued in their individual capacities and as
24   employees of Contra Costa County, CONTRA
     COSTA COUNTY SHERIFF'S DEPUTIES
25   ARANDA AND HADLEY, sued in their
     individual capacities and as employees of Contra
26   Costa County, SHERIFF WARREN RUPF,
     CALIFORNIA AND DOES ONE through ONE
27   HUNDRED, et al.,

28               Defendants.
     _____/

**United States District Court**
For the Northern District of California

**INTRODUCTION**

This civil rights action stems from the investigation of the murder of Pamela Vitale on October 15, 2005, and the search surrounding the arrest of Scott Dyleski who was ultimately convicted of the crime. Defendants now move for summary judgment on plaintiffs' claims under 42 U.S.C. 1983 and California state law. Defendants have shown that there are no triable issues of fact remaining as to whether they had probable cause to enter plaintiffs' house. Also, defendants have shown that there were exigent circumstances, including a substantial risk of destruction of evidence, that justified the warrantless entry. Furthermore, there remain no triable issues of fact as to whether the manner of entry and subsequent detention were lawful. There is a narrow triable issue of fact remaining, however, on whether plaintiff Michael Sikkema went willingly with defendants to the Field Operations Bureau. Defendants moved for summary judgment on plaintiffs' *Monell* claim on the grounds that there were no underlying constitutional violations. Here, plaintiffs have shown that there is a triable issue of fact, thus summary judgment on the *Monell* claims is not appropriate. As to plaintiffs' state-law claims, defendants are either immune from suit or plaintiffs have not demonstrated triable issues of fact as to whether the use of force was excessive. Sikkema's claim for violation of California Civil Code § 52.1 survives to the extent that it is based on his transport to the Field Operations Bureau. Accordingly, defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

Plaintiffs Kimberly Marie Curiel, Frederick Michael Curiel, and their children M.T.C., T.A.C., and J.A.C., and Hazel Ann McClure and Michael Jason Sikkema and their children D.A.M.S. and C.R.M.S. were present at 1050 Hunsaker Canyon on the evening of October 19, 2005. Defendants Sheriff Warren Rupf, Lieutenant Kathleen Parker, Sergeants James Mahoney and Kevin Daly, Detectives Jason Barnes, Gary Clark, Cary Goldberg, Joseph Moore, Guy Uyeda, Aaron Van Zelf, Laurie Bailey, Todd Santiago, Martin Ryan, Roque Barrientos, Aldaberto Garibay, Rachel Fawell, and Rudolph Oest, and Deputies Oscar Aranda and Dale Hadley were members of the Contra Costa County Sheriff's Department.

**United States District Court**
For the Northern District of California

1    **1.    INVESTIGATION OF THE VITALE HOMICIDE.**

2    As stated, this action stems from the investigation of the murder of Pamela Vitale on

3    October 15, 2005.  On the afternoon of October 19, 2005, Joseph Motta, an attorney, contacted

4    Contra Costa County deputy district attorney William Clark regarding one of Motta's clients,

5    Tom Croen and his son Robin Croen (Clark Decl. ¶ 3).  Clark consulted with Motta and the

6    Croens at Motta's office about Vitale's murder (*ibid.*).  Based on his conversation with Croen

7    and Motta, Clark believed the Croens' statements would provide probable cause to support a

8    warrant to arrest Scott Dyleski, a friend of Robin Croen, on suspicion of homicide and credit

9    card fraud (*id.* at ¶ 4).

10    Clark then spoke with Detective Shawn Pate, a lead investigator on the Vitale homicide

11    (Seaton Decl. Exh. 1, 16:9–13).  Pate met with Robin Croen at Motta's office (*id.* at 17:6–17).

12    The interview was recorded and later transcribed.  Robin Croen gave details about a credit card

13    fraud scheme that he and Dyleski had orchestrated (Pate Decl. Exh. 1, 2–3).  Dyleski and Robin

14    Croen were planning to steal credit card numbers on the internet and use them to place orders

15    for materials and paraphenalia for growing marijuana (*id.* at 3).  Robin Croen emailed Dyleski

16    telling him what items they would need, and Dyleski stole the credit card information and

17    placed the orders using his home computer starting on October 12, 2005 (*id.* at 5–6).  Dyleski's

18    computer was located at the Curiel house.

19    Dyleski and a friend came to Robin Croen's house on the evening of Saturday, October

20    15 (*id.* at 9).  Robin Croen stated that he noticed scratches on Dyleski's nose (*id.* at 10).

21    Dyleski left a voice-mail message on his cell phone on Monday, October 17, saying that he

22    wanted to get together that evening (*id.* at 13).  Robin Croen described Dyleski's voice as "a

23    little rushed" and "a little excited" (*ibid.*).  The next day, Tuesday, October 18, Dyleski came to

24    visit Robin at his high school (*id.* at 14).  Dyleski seemed agitated and told Robin that he was

25    considering admitting his involvement in the credit card fraud scheme to Fred Curiel, an adult

26    who lived in the same house (*id.* at 15).  Dyleski also expressed a fear of being connected with

27    the Vitale homicide (*id.* at 16).  Dyleski told Robin that he had encountered her while he was

28    walking in Hunsaker Canyon.  He startled her; she grabbed his wrists and scratched him (*id.* at

United States District Court

For the Northern District of California

17–18).  Dyleski said that because of that encounter, he feared that Vitale's DNA would be found on his person.

Pate also spoke with Robin's father Tom Croen, who had spoken with Fred Curiel on Tuesday, October 18 (*id*. at 23).  Fred told Tom that he was concerned that Dyleski was stealing credit card information and wanted to know if Robin was also involved (*ibid*.).  Fred stated that he had looked at Dyleski's computer and was afraid that some of the items the boys had ordered had been sent to Vitale's address and feared that the boys were involved in her death (*id*. at 24).  According to Fred Curiel, Dyleski had attempted to wipe the home computer clean of evidence of the credit card fraud (*id*. at 23–24).  Fred and Tom looked at Robin Croen's computer and confirmed that some of the items had been sent to Pamela Vitale's address (*id*. at 24–25).  Later in the interview, Robin Croen recognized a symbol from Dyleski's artwork that matched a symbol that was carved into Vitale's back (*id*. at 28–29).

Robin Croen also gave the detectives details about Dyleski's living situation at 1050 Hunsaker Canyon and the layout of the property.  Robin stated that Dyleski lived there with his mother (*id*. at 33).  Two other couples, Fred and Kim Curiel and Michael Sikkema and Hazel Ann McClure, lived there as well with their children (*id*. at 34).  Robin Croen gave a physical description of Dyleski and drew a rough layout of the house (*id*. at 34–35).  He also stated that he had not generally known Dyleski to be violent, but that Dyleski's absent father had stored a shotgun in the house (*id*. at 37).

### 2.  THE WARRANT.

Prior to meeting with Robin and Tom Croen, Pate contacted Sergeant James Mahoney and told him to assemble deputies at the Field Operations Bureau; Pate did not give Mahoney any details (Seaton Decl. Exh. 1, 17:9–17).  In turn, Mahoney called his supervisor, Lieutenant Kathleen Parker (*id*. at Exh. 4, 23:20–25).

Pate and Barnes ordered a warrantless entry of the house based on what they had learned from Croen (Pate Decl. ¶ 11).  The detectives both declared that based on their observation of the crime scene, the suspect likely would have had blood on his clothes, and that there existed a significant chance that the suspect would attempt to destroy that evidence (Pate Decl. ¶¶ 4–6;

1   Barnes Decl. ¶¶ 4–6).  While Pate was interviewing Robin and Tom Croen, Barnes drafted

2   affidavits and warrant papers, receiving periodic updates from Pate and the other officers

3   (Barnes Decl. ¶ 11).  Pate also declared that he believed there was a strong likelihood that

4   Dyleski would destroy evidence because he had already attempted to destroy evidence of the

5   credit card scheme, the Curiels had failed to come forward with information about the homicide

6   and the credit card fraud, the Curiels had visited an attorney, and Robin Croen's testimony that

7   Dyleski was agitated and nervous (Pate Decl. ¶ 15).  Pate also feared that Robin Croen might tip

8   off Dyleski that he was under suspicion, accidentally or not (*id*. at ¶ 16).

9        Pate and Barnes consulted with Clark and suggested locking down the house before they

10  could obtain a warrant (Pate Decl. ¶ 17; Barnes Decl. ¶ 12).  Around the same time, Clark

11  contacted Contra Costa County Superior Court Judge William Kolin to apply for a search

12  warrant (Clark Decl. ¶ 6).  Judge Kolin conducted a hearing at around 9:00 p.m. at the offices of

13  Joseph Motta (*id*. at ¶ 11).  Judge Kolin reviewed the warrants and affidavits and signed them at

14  approximately 10:55 p.m. (*ibid*.).  After Judge Kolin left the offices, Clark and Barnes noticed

15  that the box marked "nighttime service" was not checked (*id*. at 13; Barnes Decl. ¶ 15).  Barnes

16  left a message at Judge Kolin's home as he did not have his cell phone number (Barnes Decl. at

17  ¶ 16).  Judge Kolin authorized Barnes to sign a new search warrant, confirmed that he had

18  authorized nighttime service and faxed written confirmation to Barnes at 1:36 a.m. the next

19  morning (*id*. at ¶ 17; Exh. 1).

20        **3.    ENTRY AND SEARCH OF THE HOUSE.**

21        While Pate and Barnes were in the process of getting a warrant, Mahoney briefed the

22  assembled deputies and officers at the Field Operations Bureau and told them the address of the

23  house, the suspect's first name, and that no warrants had yet issued (Seaton Decl. Exh. 4,

24  32:8–33:13).  The deputies were told that the planned search was in connection with the Vitale

25  homicide.  Mahoney testified that he was aware that several families lived in the house, but that

26  he had not verified that Dyleski would be present in the house (*id*. at 42:5–43:6).

27        The team arrived at 1050 Hunsaker Canyon at about 8:30 p.m.  Defendants had not yet

28  obtained a search warrant.  With Parker's approval, Mahoney had made the decision to "lock

United States District Court

For the Northern District of California

5

United States District Court

For the Northern District of California

1   down" the property.  Mahoney testified in his deposition that he feared evidence would be

2   destroyed, though he had little information regarding precisely who would be present in the

3   house (*id.* at 74:15–76:5).  Parker, Mahoney, Goldberg, Bailey, Fawell, Garibay, Moore, Uyeda,

4   Santiago, and Ryan conducted the entry into the Curiel house.  Daley, Clark, Van Zelf, and Oest

5   were stationed outside the house and came in after the initial entry.  They stayed with plaintiffs

6   until the warrant was served.  Defendants Aranda and Hadley, a trainee, later brought a digital

7   recorder to the house after entry.

8         The entry team approached 1050 Hunsaker Canyon at approximately 8:35 p.m.

9   Testimony conflicts as to whether the deputies performed a "knock-notice" before entering the

10  house.   Defendant Uyeda testified that no one knocked on the door before entering.  Upon

11  approaching the house, Uyeda reported seeing people running to the back of the house.  Uyeda

12  then yelled "compromise!" — a signal that no knock was necessary and that the officers should

13  enter the house (Seaton Decl. Exh. 9, 29:3–24).  Parker testified that she only heard the signal

14  and not a knock at the door (*id.* at Exh. 4, 53:2–4).  Fred Curiel reported in his deposition that

15  he heard pounding on the front door which first alerted him to the officers' presence (Hopkins

16  Decl. Exh. 15, 111:1–18).  J.M.C. testified that she heard pounding on the front door and loud

17  voices and then ran to the back of the house (*id.* at Exh. 7, 9:20–10:21).  T.A.C. also testified

18  that she heard knocking on the door while she was in the living room with her sister J.M.C. (*id.*

19  at Exh. 6, 8:15–25).  It is not clear how much time elapsed between the pounding on the door

20  and deputies entry into the house.

21        T.A.C. and J.M.C. ran to their mother Kim Curiel's room where she was sleeping.  Fred

22  Curiel testified that he did not know that the people entering were police officers.  He saw a

23  crouched figure in black clothing coming toward him who was later revealed to be Santiago

24  (Seaton Decl. Exh. 11, 120:1–10).  Santiago had gone around to the back of the house and

25  entered through the open back door (*id.* at Exh. 18, 27:4–20).  Santiago testified that he had

26  identified himself as a police officer.  He then ordered Fred Curiel to get on the ground while

27  pointing a weapon at him (*id.* at Exh. 11, 126:4–12).  Santiago pushed him to the ground,

28  although Curiel testified that he did not resist (*id.* at 127:10–128:20).  Curiel did not report

suffering any physical injury as a result of Santiago's actions, although his head did hit the carpeted floor. Santiago testified that Parker entered the room shortly thereafter and helped him handcuff Fred Curiel (*id*. at Exh. 18, 29:10–30:9).

J.M.C., an 11-year-old girl, ran into the room and Parker pointed her weapon at her (*id*. at Exh. 11, 61:10–62:15). After J.M.C. got on the floor, Fred Curiel testified that he saw Parker place a booted foot on her back, and Parker's right knee was placed across J.M.C.'s shoulder (*id*. at 130:20–131:2). At some point, Curiel also saw Parker lose her balance and sit or land on J.M.C.'s back (*id*. at 215:18–216:2). Kim Curiel testified that her daughter's back was reddened but not bruised as a result (*id*. at Exh. 13, 139:7–19). Fred Curiel also testified that Santiago slammed his head into a carpeted floor, but he did not suffer any resulting injury (*id*. at Exh. 11, 154:15–155:14). He remained handcuffed on the floor for about 15 minutes, and after complaining about the handcuffs, they were removed at approximately 9:30 p.m. (*id*. at 291:10–292:21).

Kimberly Curiel, J.M.C., T.A.C. and Michael Sikkema ultimately ended up in the living room. An armed female deputy directed Kim Curiel to get on the ground (*id*. at Exh. 12, 59:13–19). T.A.C. ran into the room, and the female deputy ordered her onto the ground as well. She did so, and then crawled over to where her mother was lying (*id*. at Exh. 14, 15:20–17:7). M.T.C. testified in her deposition that she had been in her room when the deputies entered. Frightened, she had crouched in her bedroom closet (*id*. at Exh. 15, 10:3–11:15). Deputy Moore entered the room damaging the door, and found M.T.C. (*id*. at Exh. 8, 49:3–17). He ordered her to the get on the ground, and then took her downstairs where she was ordered to lie down on the floor (*id*. at Exh. 15, 15:3–18:11).

Shortly thereafter, Michael Sikkema returned to the house carrying flowers and a bag of groceries (*id*. at Exh. 17, 53:1–5). Sikkema was confronted by Mahoney and Fawell. In his deposition, Sikkema testified that Mahoney yelled at him "I'm going to blow your fuckin' head off" and used other obscenities and threats (*id*. at 59:8–22). The officers in their depositions denied using or hearing any such language. At some point deputies handcuffed him, and

1    Sikkema reported that the handcuffs were on for approximately twenty minutes (*id*. at

2    129:20–25).

3         Hazel McClure was in an upstairs bedroom with her two children, C.R.M.S. and

4    D.A.M.S., when the deputies entered the house.  Upon hearing that people had entered the

5    house, McClure picked up the children and hid in the bathroom (*id*. at Exh. 16, 58:1–4).

6    McClure testified that she heard someone kick down the bedroom door, and then open the

7    bathroom door (*id*. at 60:1–11).  Uyeda entered with his gun drawn (*id*. at Exh. 9, 37:9–20).

8    McClure and her children were led downstairs to the living room.

9         One of the officers asked Kim Curiel if she knew where Scott Dyleski was.  She

10   answered that Dyleski was at her brother Marcus Hogg's house in Walnut Creek (*id*. at Exh. 12,

11   70:16–71:10).  Mahoney then decided that four deputies — Daley, Oest, Van Zelf, and Clark —

12   should stay at the Curiel house, while the rest would go to Walnut Creek to continue looking for

13   Dyleski (*id*. at Exh.4, 70:1–13).  The four officers were ordered to remain at the Curiel house

14   until a search warrant was signed (*id*. at Exh. 3, 68:15–24).

15        Plaintiffs were ordered to stay on the couches and chairs in the downstairs living room.

16   They were allowed to get up to use the restrooms and get blankets and food for the children

17   with the officers' permission (*id*. at Exh. 6, 33:21–34:10).  Some of the plaintiffs were

18   questioned at the house.  Michael Sikkema testified that he was ordered to go to the Field

19   Operations Bureau for questioning.  He did not recall asking whether or not he was required to

20   go to the station, only that someone told him he was going to the Bureau (*id*. at Exh. 17,

21   90:17–91:6).  Fred Curiel and Hazel McClure were also taken to the Bureau for questioning, as

22   was Dyleski's mother Esther Fielding, who is not a plaintiff in this action (*id*. at Exh. 12,

23   84:12–13; Exh. 11, 189:3–8).  Kim Curiel testified in her deposition as follows (Hopkins Decl.

24   Exh. 5, 79:7–13):

25        Q.    After they took Fred's handcuffs off, what is the next
              thing that occurred?

26
         A.    They [the officers] asked Esther, Fred, Michael if they'd
27             be willing to go downtown to make a statement.

28        Q.    And what did they say?

8

A.     They said they would, and they got up to go.

Hazel McClure testified at her deposition that there was no discussion of whether or not plaintiffs were free to leave the premises (*id*. at Exh. 16, 75:16–25).  Plaintiffs were aware that they were not suspects in either the homicide or the credit card fraud.  Fred Curiel returned to the house at around 5:00 a.m. (*id*. at Exh. 11, 279:9–10).  Shortly after midnight, the search of the house began.  Plaintiffs testified that they were not allowed to move about the house until 9:00 a.m.  The search lasted until approximately 11:00 a.m. the next morning.

**4.     PROCEDURAL HISTORY.**

This action was filed on September 19, 2006.  An amended complaint was filed on February 5, 2007, naming additional defendants.  Plaintiffs alleged the following claims:  (1) a violation of 42 U.S.C. 1983 against all individual defendants; (2) a claim for supervisory liability under 42 U.S.C. 1983 against Rupf in his individual capacity, Parker, Mahoney, and Daley; (3) a *Monell* claim against Contra Costa County; (4) trespass against all defendants; (5) false imprisonment against all defendants; (6) assault against all defendants; (7) battery by plaintiffs J.M.C. and Fred Curiel against all defendants; (8) intentional infliction of emotional distress against all defendants; (9) negligent infliction of emotional distress against all defendants; and (10) violations of California Civil Code §§ 52 and 52.1 against all defendants.  This motion was filed on May 22, 2007.

A hearing was held on August 2, 2007.  Thereafter, an order issued asking plaintiffs and defendants for supplemental briefing on the narrow issue of whether plaintiffs Kim Curiel, Fred Curiel, and Michael Sikkema went willingly to the Field Operations Bureau for questioning.  Parties were requested to confine their submissions to the summary-judgment records.  Briefs were submitted on August 10, 2007.

**ANALYSIS**

Summary judgment should be granted where the pleadings, discovery, and affidavits show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FRCP 56(c).  The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact.  *Playboy*

*Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1023–24 (9th Cir. 2004). Once the moving party has met its initial burden, the nonmoving party must "designate specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (citation omitted).

Defendants move for summary judgment on the ground that they are entitled to qualified immunity for their actions. First, they argue that there was no violation of plaintiffs' constitutional rights. Second, at all events, a reasonable officer in defendants' position would not have been on notice that their actions were violating plaintiffs' constitutional rights. Third, defendants contend that because there was no violation of a constitutional right, plaintiffs' *Monell* claims must be dismissed. Fourth, plaintiffs' claims against Sheriff Warren Rupf should be dismissed because plaintiffs did not allege his personal involvement and because he is immune from suit as a state official under the Eleventh Amendment. Finally, defendants argue that plaintiffs' state-law claims fail because defendants are immune from suit under California law and because there was no underlying violation of plaintiffs' constitutional rights. It is true that there are certain fact disputes. For the reasons stated below, however, all but one of them are not material.

### 1. CONSTITUTIONAL VIOLATIONS.

Plaintiffs identified four ways in which defendants violated their constitutional rights under the Fourth Amendment. First, they argue that defendants' entry into the Curiel house without a warrant was not justified by exigent circumstances. Second, plaintiffs argue that even if defendants' warrantless entry was justified, defendants did not comply with "knock and announce" procedures. Third, plaintiffs contend that defendants used excessive force in entering and securing the house and that the detention of plaintiffs was overly long and restrictive. Finally, they contend that taking plaintiffs' to the Field Operations Bureau violated their constitutional rights.

United States District Court
For the Northern District of California

### A.    Warrantless Entry.

"The securing of a residence by police constitutes a 'seizure' under the Fourth Amendment." *United States v. Perdoma*, 800 F.2d 916, 918 (9th Cir. 1986).  Without a warrant, such a seizure violates the Fourth Amendment unless it falls within an established exception, such as a protective sweep incident to an arrest or exigent circumstances. *See Warden v. Hayden*, 387 U.S. 294, 298 (1967).  Warrantless entry is prohibited unless the police have probable cause and can show exigent circumstances. *LaLonde v. City of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000).  Here, defendants concede that they did not have a warrant at the moment of entry and instead argue their entry was justified by exigent circumstances.

### (1)    *Probable Cause.*

Defendants present evidence that they had established probable cause before going to the Curiel house.  Probable cause requires a fair probability or substantial chance of criminal activity, as determined by the totality of the circumstances known to the officers at the time. *United States v. Alaimalo*, 313 F.3d 1188, 1193 (9th Cir. 2002).  Here, defendants contend that statements from Robin Croen and Tom Croen established probable cause that the officers would find evidence of Vitale's murder and the credit card fraud scheme at the Curiel house.  Robin Croen admitted that he and Dyleski had conducted the credit card fraud scheme.  Robin Croen also established that Dyleski was growing increasingly nervous about being implicated in the Vitale homicide because Dyleski had told him he feared that Vitale's DNA could have ended up on his person.  Tom Croen's statements revealed that Fred Curiel was also panicking about the connection between the fraud and the murder because they had discovered Vitale's address on some of the packages ordered with stolen credit card numbers.  Fred Curiel also stated that Dyleski had tried to wipe his computer, which was located in the Curiel house, clean of evidence of the credit card fraud scheme.  Finally, Robin Croen established that Dyleski lived, at least part of the time, at the Curiel house.  Defendants also point out that a warrant issued based on the same facts once Pate and Barnes were able to hold a hearing.  The warrant was upheld in the criminal case against Dyleski.

Plaintiffs do not dispute the contents of the Croens' statements; they contest only Pate and Barnes' conclusions. They point out that none of the evidence defendants present to establish probable cause showed that Scott Dyleski would actually be at the Curiel house on the night of October 19, 2005. Plaintiffs are correct that Robin Croen testified that Dyleski did not stay at the Curiel house all of the time and that none of the officers knew for sure that Dyleski would actually be there at the time they were searching. Certainty that Dyleski was in the house at the time is simply not necessary for a lawful search. *See Los Angeles v. Rettele,* ___ U.S. ____, 127 S. Ct. 1989, 1992 (May 21, 2007) (upholding grant of qualified immunity where the house searched had been sold to other people, and officers found and detained occupants of a different race than the subjects of the warrant). Furthermore, in searching Dyleski's house the officers were looking not only for Dyleski himself, but also for evidence connected to the crime. Plaintiffs also contend that the Croen's statements did not link Dyleski to the Vitale homicide. Robin Croen established that Dyleski had already told Fred Curiel of his involvement in the credit-card fraud, and that Dyleski feared that he could be connected to the Vitale homicide. The statements also indicated that Dyleski was nervous and agitated, and that some of the items ordered with the stolen credit card numbers were sent to Vitale's address. Accordingly, defendants had probable cause to search the house.

**(2)   *Exigent Circumstances.***

Exigent circumstances are defined as "those circumstances that would cause a reasonable person to believe that entry (and other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement effort." *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc). "The government bears the burden of showing the existence of exigent circumstances by particularized evidence." *United States v. Tarazon*, 989 F.2d 1045, 1049 (9th Cir. 1993). Conditions constituting exigent circumstances include the need to protect officers or the public from danger, the need to avoid imminent destruction of evidence, the need to prevent a

suspect's escape, and the need to respond to other emergencies.  *United States v. Brooks*, 367

F.3d 1128, 1133 n.5 (9th Cir. 2004) (citations omitted).

Exigent circumstances can be shown where "police officers . . . reasonably believe from

the totality of the circumstances that (a) evidence or contraband will imminently be destroyed or

(b) the nature of the crime or character of the suspect(s) pose a risk of danger to the arresting

officers or third persons."  *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002) (citation

omitted).  Merely stating that evidence is present is not sufficient; there must be some showing

that removal or destruction of evidence is imminent.  *United States v. Driver*, 776 F.2d 807, 810

(9th Cir. 1985).  In support, defendants contend that they were afraid that Dyleski would

destroy evidence of the crimes and that he could flee or be a danger to the officers or third

parties.

Again relying on statements by Robin and Tom Croen, defendants present powerful

evidence that Dyleski was agitated and afraid that he could be connected to the Vitale homicide.

Dyleski had already attempted to "wipe[] his computer clean" of evidence of the credit card

fraud scheme (Pate Decl. Exh. 1, 23).  The computer was located at the Curiel house.  Fred

Curiel had approached Tom Croen wanting to know if there was any such evidence on Robin's

computer.  Curiel also knew that Robin Croen and Dyleski had sent packages to Pamela

Vitale's address.  Moreover, Dyleski had told Robin Croen the story about encountering Vitale

in the woods in which Dyleski had expressed his concern about being connected to her

homicide.  Pate and Barnes had observed the crime scene and declared that because of the

nature of the crime, the suspect likely had the victim's blood and DNA on his or her clothes.  A

canine search of the woods surrounding the crime scene turned up no murder weapon or

clothing.  Thus, they concluded that the suspect likely retained possession of those items.

Based on Pate and Barnes' experience, blood and DNA evidence on clothing is easily washed

or destroyed.

Plaintiffs argue that defendants have presented no evidence that Dyleski was aware that

he was suspected in the Vitale homicide.  This hardly matters because defendants have

established, and plaintiffs do not refute, that Dyleski was agitated and had already attempted to

13

destroy evidence of his involvement in the credit card scheme.  He also feared being connected to the Vitale homicide.  Plaintiffs repeat the argument that defendants had not verified that Dyleski was actually at the Curiel house on the evening it was to be searched.  As it was in the discussion of probable cause, this argument is a red herring.  The officers did not need to be certain Dyleski would be there at the time.  Defendants were likely to find evidence there because the Curiel house was located within walking distance of the crime scene and the officers had established that the perpetrator left the scene on foot.  The officers were attempting to get a warrant at the time, but they also feared that Robin Croen might tip off Dyleski to the fact that he was a suspect in the Vitale homicide.  It was not necessary for the officers to know for sure the whereabouts of Dyleski, only that there was a reasonable possibility that Dyleski was himself at the residence (or that a confederate might be at the residence), thus placing the murder evidence in peril.

Another factor to consider is the severity of the crime at issue.  Neither side disputes that the crime at issue was an exceptionally brutal and vicious homicide.  Plaintiffs point out that the seriousness of the offense in itself cannot create exigent circumstances sufficient to justify a warrantless seach. *Mincey v. Arizona*, 437 U.S. 385, 394 (1978).  It is, however, still a significant factor.  In combination with the rest of the circumstances, the severity of the crime increased the incentives for all of those connected with it to destroy evidence, to flee, and to place others in danger, all the moreso given that Dyleski was said to be worried about detection even if he did not know for sure that he was under supervision.  Even viewing the evidence that in the light most favorable to the plaintiffs, defendants have eliminated all triable issues of fact as to whether exigent circumstances justified warrantless entry into the Curiel house.

### B.    Use of Force in Entering the Curiel House.

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citations omitted).  Determining whether the force used was reasonable "requires careful attention to the facts and circumstances

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Ibid*. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . ." *Id*. at 396–97.

### (1)     *Knock and Announce.*

Plaintiffs first contend that defendants' failure to "knock and announce" violated their Fourth Amendment rights.  Officers executing a warrant are generally required to knock on the door or otherwise announce their presence before forcibly entering.  The common-law requirement to knock and announce forms part of the reasonableness inquiry under Fourth Amendment law; it is not a predicate to a constitutional search or seizure.  *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995).  The amount of time officers are required to wait after announcing their presence is very fact-specific.  *United States v. Banks*, 540 U.S. 31, 37–38 (2003) (holding that an interval of fifteen to twenty seconds was sufficient where officers had a reasonable suspicion that a suspect could destroy narcotics, even though the suspect was actually in the shower).  The act of knocking on the door is not always dispositive particularly where the officers made their presence known by other means, such as nearing the house or running up stairs to an apartment.  *See United States v. Combs*, 394 F.3d 739, 744–45 (9th Cir. 2005).

To justify a "no-knock" entry, "the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence."  *Richards v. Wisconsin*, 520 U.S. 385, 395 (1997).  Even if the warrant itself is silent on whether a no-knock entry is allowed, exigency sufficient to justify a no-knock entry may later arise while executing the search or seizure  *Id*. at 394, 396.  The Ninth Circuit has held that any one of the exigent circumstances enumerated in *Richards* — danger, flight of a suspect, or destruction of evidence — is sufficient to justify a no-knock entry.  *United States v. Bynum*, 362 F.3d 574, 579 (9th Cir. 2004).

United States District Court

For the Northern District of California

1    Defendants acknowledge that there is a factual dispute over whether the officers

2  knocked and announced before entering.  They present evidence that the occupants of the house

3  heard the officers knock on the door.  Specifically, Fred Curiel, T.A.C. and M.T.C. all heard

4  someone pounding on the door and yelling, although they could not make out what was being

5  said.  Plaintiffs point out that defendants Uyeda and Parker did not recall if anyone had knocked

6  on the door before the officers entering.  Uyeda testified that he recalled yelling "compromised"

7  when he saw the occupants running toward the back of the house.  Accordingly, there remains a

8  factual dispute as to whether defendants followed knock-and-announce procedures, and if they

9  did, how long they waited before entering the house.

10    This factual dispute does not create a triable issue of fact, because even when analyzed

11  under the standard for a no-knock entry, the officers' actions were still reasonable.  The officers

12  and deputies feared that evidence would be destroyed, and once they saw the occupants of the

13  house running, they reasonably believed that knocking would have been futile.  The officers

14  also feared that occupants might destroy or tamper with evidence of the murder, inadvertently

15  or not.  Robin Croen had also alerted the Pate and Barnes to the fact that Dyleski's absent father

16  kept a shotgun in the Curiel house which raised the concern that Dyleski could be armed.

17  Finally, when the officers arrived at the Curiel house and began their approach, they saw people

18  inside the house running toward the back door.  This indicated that the occupants were aware of

19  the officers' presence and would not be willing to open the door.  The Curiel house was located

20  in a wooden area, and the police arrived at the house at around 8:30 p.m., so the area

21  surrounding the house was dark.  The officers reasonably believed that someone in the house

22  was preparing to flee or destroy evidence, so they entered the house.  Thus, even if none of the

23  officers knocked on the door, and regardless of how much time may have passed between a

24  knock at the door and defendants' entry, defendants actions were still reasonable under a no-

25  knock standard.

26    Plaintiffs argue that no such exigency existed that would have justified a no-knock

27  entry.  Plaintiffs do not dispute that people inside the house started running once they heard the

28  officers outside, but instead point out that the people running toward the back of the house were

United States District Court

For the Northern District of California

1   actually young girls.  Plaintiffs also repeat that the officers had not made certain that Dyleski

2   would be in the house at that time, and that Tom and Robin Croen's statements had not

3   established that Dyleski knew that he was being suspected of murder.  Again, the officers need

4   not have known for certain that Dyleski would be there at the time.  Finally, they also contend

5   that although Robin Croen stated that there was a gun in the house, but gave the officers no

6   reason to believe that Dyleski or any other resident was violent or involved with guns.

7           The officers never testified that they had recognized the people running toward the back

8   of the house as young girls, they merely saw people running to the back of the house.

9   Moreover, viewed from the perspective of an officer under the same circumstances, such

10  activity would indicate that the occupants were attempting to flee or would be unwilling to open

11  the door.  These actions, under the circumstances, support a reasonable belief that knocking on

12  the door would have been futile.  As to Robin and Tom Croen's statements, they established

13  that Dyleski had already destroyed evidence and that he feared being connected with the Vitale

14  homicide.  Plaintiffs' contention that the officers were unreasonable in thinking that Dyleski

15  could be violent or dangerous ignores the fact that he was a suspect in a very brutal homicide.

16  Even viewing the facts in the light most favorable to plaintiffs, a reasonable jury would be

17  obliged to find that defendants' actions in performing a no-knock entry were lawful.

18  Accordingly, no triable issues of fact remain, and summary judgment for defendants is

19  appropriate on this issue.

20                          **(2)    *Force Used in Detaining Plaintiffs.***

21          Plaintiffs allege that defendants used excessive force in entering the house and detaining

22  plaintiffs.  Plaintiffs contend that the officers' entering the house with their guns drawn,

23  pointing the guns at the occupants, and yelling and using curse words constituted excessive

24  force.  "While it seems unlikely that harsh language alone would render a search and seizure

25  unreasonable, verbal abuse may be sufficient to tip the scales in a close case."  *Holland ex rel.*

26  *Overdorff*, 268 F.3d 1179, 1194 (9th Cir. 2001).  Fred and Kim Curiel testified that the officers

27  entered the Curiel house using profanity and threats.  (The defendant officers testified that they

28  did not recall hearing the use of profanity, but this order assumes that they did so, as alleged.)

United States District Court

For the Northern District of California

1    Plaintiffs, however, present no evidence that such profanity continued after the deputies had

2    secured the house.

3         Plaintiffs also allege that defendants' entry into the house with guns drawn, and later

4    pointing guns at them, constituted excessive force.  Plaintiff cites *Baldwin v. Placer County*,

5    418 F.3d 966, 970 (9th Cir. 2002), for the proposition that "paramilitary-style" entries with guns

6    drawn are improper.  That decision is distinguishable; where the officers in *Baldwin* had

7    articulated no facts supporting the inference that the suspect was armed or dangerous, here,

8    defendants have done so.  Moreover, the officers in *Baldwin* were investigating a small

9    marijuana growing operation, not a homicide.  *Id*. at 968.  Simply put, defendants had no way of

10   knowing who they would encounter on entering 1050 Hunsaker Canyon.  There is no dispute

11   that the officers were aware that small children might be present in the house, but they were

12   also looking for a suspect in a homicide who was potentially armed.  Dylseki himself might

13   have been armed as might have been a confederate.  Faced with a potential for harm to

14   themselves as well as others, the officers acted reasonably under the circumstances.  Moreover,

15   as with the use of foul language, plaintiffs present no evidence that the officers continued to

16   point guns at plaintiffs after the house had been secured.

17        Plaintiffs also argue that the handcuffing of Sikkema and Fred Curiel constituted

18   excessive force.  Governmental interests in using handcuffs are at a maximum when pursuing

19   dangerous suspects with a reasonable belief that they may be armed, and are at a minimum

20   when pursuing unarmed suspects in non-violent crimes.  *See Baldwin*, 418 F.3d at 970 (holding

21   that a paramilitary style, no-knock entry, pointing guns at suspects and handcuffing them was

22   unlawful when search non-violent suspects for marijuana growing materials).  Overly tight

23   handcuffs can constitute excessive force.  *Meredith v. Erath*, 342 F.3d 1057, 1062 (9th Cir.

24   2003) (holding that placing a detainee in handcuffs was unlawful where officers were

25   investigating tax fraud and the handcuffs caused the plaintiff pain).

26        Neither side disputes that Fred Curiel and Sikkema were handcuffed before defendants

27   knew their identity.  Fred Curiel testified that Santiago pushed or shoved his head into a

28   carpeted floor.  By all accounts, he suffered no injury from Santiago's actions.  While

18

United States District Court

For the Northern District of California

1   handcuffed, Fred Curiel complained that the handcuffs were hurting him. They were removed

2   at approximately 9:30 p.m., after the house was secured and after the majority of the deputies

3   left. Sikkema was handcuffed for approximately twenty minutes. Here, the officers' actions

4   were reasonable under the circumstances. It is undisputed that they entered a house looking for

5   a violent male suspect in a murder case. The only people they handcuffed were adult males

6   found in a known residence of the suspect. Once the situation had calmed down and the

7   officers were certain that the men did not pose any danger, the handcuffs were removed.

8   Neither Sikkema nor Fred Curiel suffered any lasting injury. Accordingly, defendants' actions

9   were reasonable under the circumstances.

10         Finally, plaintiffs allege that Parker's use of force against J.M.C. was excessive and

11   unreasonable. Parker testified that she lightly placed her foot on J.M.C.'s back in the initial

12   stages of securing the Curiel house because J.M.C. was wriggling and twitching. J.M.C.

13   testified that she had complied with Parker's demands. Later, both sides agree that Parker lost

14   her balance causing her to put more weight on J.M.C.'s back. J.M.C. later reported no bruising

15   or pain, only redness of her back. Even viewing the evidence in the light most favorable to

16   plaintiffs, Parker's actions were reasonable under the circumstances because of the very

17   minimal amount of force used and the need to maintain the security of the scene.

18                       **(3)     *Duration of Detention.***

19         Plaintiffs argue that the duration and nature of the detention was unreasonable and

20   violated plaintiffs' Fourth Amendment rights. Officers executing a search warrant have

21   authority to detain the occupants of the premises while a proper search is conducted. *Michigan*

22   *v. Summers*, 452 U.S. 692, 705 (1981). "An officer's authority to detain incident to a search is

23   categorical; it does not depend on the quantum of proof justifying detention or the extent of

24   intrusion to be imposed by the seizure." *Muehler v. Mena*, 544 U.S. 93, 100 (2005) (upholding

25   a search of an interior of a home taking approximately four hours during which occupants were

26   handcuffed). A detention in connection with a search may be unlawful if is unnecessarily

27   painful, degrading, or prolonged. *Franklin v. Foxworth*, 31 F.3d 873, 876 (1994). The

28   detention of the residents of a boardinghouse for several hours to investigate health code

United States District Court

For the Northern District of California

1   violations was held to be a reasonable seizure.  *Dawson v. City of Seattle*, 435 F.3d 1054,

2   1069–70 (9th Cir. 2006).

3       Neither side disputes that plaintiffs were detained for approximately thirteen hours while

4   the deputies awaited the issuance of a warrant and then completed a search of the house and the

5   surrounding wooded area.  Likewise, neither side disputes that plaintiffs were ordered to stay in

6   the living room area.  If they asked permission from the officers, plaintiffs were allowed to use

7   the bathroom and get food and blankets for the children.  Plaintiffs were permitted to sleep on

8   the couches and chairs in their living room while the search was being conducted.  Plaintiffs

9   were not allowed to use the telephone.  The facts of the detention itself are not contested.

10      Plaintiffs divide the period of detention into two portions — from about 8:30 p.m. until

11  1:30 a.m. when defendants got a warrant and the remainder of the time when defendants were

12  searching the house and the surrounding area.  They argue detention during the first period,

13  before the officers got a warrant, was presumptively unreasonable because there was no

14  exigency that would have justified the warrantless entry.  As described at length above, the

15  argument has already been rejected, and the defendants have shown that warrantless entry was

16  reasonable under the circumstances.

17      Turning now to the law enforcement interests in the search, defendants contend that it

18  was necessary to detain plaintiffs to conduct an orderly search.  There was a risk that the search

19  efforts could have been hindered or problems could have arisen with chains of custody and

20  tainted evidence.  The officers also had an interest in keeping plaintiffs close at hand in case

21  they needed to gain access to any locked or restricted areas.  Since Dyleski lived at 1050

22  Hunsaker Canyon, the officers reasonably thought he might be there.  Defendants also knew

23  that there was likely some evidence to be found on Dyleski's computer, which was located in

24  the house.  The Curiel house was located on a large, wooded lot, and the officers needed

25  sufficient time to search the house and the grounds.  Furthermore, defendants present evidence

26  that they took steps to minimize the pain and inconvenience of the detention.  They attempted to

27  make the occupants as comfortable as possible under the circumstances.  With permission,

28  plaintiffs were allowed to move about to use the restroom and bring food to the children.

Restricting the use of the telephone can be held to be reasonable to prevent the sending of an alert to another party about to be searched. *Ganwich v. Knapp*, 319 F.3d 1115, 1120 (9th Cir. 2003). Here, defendants were concerned that if plaintiffs were allowed to use the telephone during the search, they could alert others who were about to be searched. Indeed, Kim Curiel knew where Dyleski was that evening. This could have resulted in Dyleski's being alerted to the fact that the police were coming after him. Because this was a high-profile case, defendants also had an interest in preventing the fact of the search from being leaked to the media which would make conducting an orderly search even more difficult. Accordingly, defendants were reasonable in preventing plaintiffs from using the telephone during the search.

**(4)** *Questioning at the Field Operations Bureau.*

At oral argument, plaintiffs raised the argument that Fred Curiel, McClure and Sikkema were compelled to go to the Field Operations Bureau. This argument was barely touched on in plaintiffs' opposition. After the hearing on this motion, the Court asked plaintiffs and defendants to submit supplemental briefing on the issue of whether there was a triable issue of fact that defendants' taking plaintiffs to the Field Operations Bureau for questioning constituted a violation of their constitutional rights. Parties were cautioned not to repeat arguments from their prior briefs or oral arguments.

By citing *Michigan v. Summers*, 452 U.S. 692, 701 (1981), plaintiffs appear to argue that a detention during a search should not be exploited or unduly prolonged to gain more information. Plaintiffs argue that Sikkema "testified that he was forced to go to the FOB for questioning" (Opp. at 22). Sikkema's deposition testimony, to which plaintiffs cited, states (Seaton Decl. Exh. 17, 90:17–91:1):

> Q.   At some point before they took you to the police station, did you say. "Do I have to go to the police station with you"?
>
> A.   I don't remember saying that.
>
> Q.   Did anybody tell you that you had to go whether you wanted to or not?
>
> A.   I was ordered to go.
>
> Q.   What was said to you?

United States District Court

For the Northern District of California

A.    "You're going to the police station with them.  Get in that car."

Kim Curiel testified that Sikkema agreed to go with the officers and give a statement.  Neither side presented additional facts regarding what took place at the Field Operations Bureau.  At least as to the Curiels and Hazel McClure, plaintiffs do not present evidence that they did not give statements willingly.  Defendants presented facts, which plaintiffs did not dispute, that plaintiffs were aware that they were not suspects in either the credit card fraud or the Vitale homicide.

Defendants first contend that there was no independent seizure of plaintiffs because they were detained under exigent circumstances and then pursuant to a search warrant.  "Mere police questioning does not constitute a seizure."  *Florida v. Bostick*, 501 U.S. 429, 434 (1991).  Law enforcement officers can permissibly question an otherwise lawfully detained citizen, and doing so does not constitute an independent event under the Fourth Amendment provided that the officers do not exploit the situation to unreasonably prolong the detention.  *Muehler*, 544 U.S. at 100–01.  Defendants also point out that any questioning occurred after the search warrant had issued and the situation at the Curiel house had calmed down considerably from the initial, chaotic entry.  Furthermore, all plaintiffs, save Michael Sikkema, transported to the Field Operations Bureau went willingly.

In response, plaintiffs present Michael Sikkema's deposition, in which he testified that he was ordered to go to the Field Operations Bureau.  Defendants seem to argue that as long as Sikkema's trip to the Field Operations Bureau did not prolong the search, it was not a violation of his Fourth Amendment rights, regardless of whether he gave consent or not.  *Muehler* and its progeny do not go so far.  Indeed, the Ninth Circuit in *Ganwich* recognized that if law enforcement officers conditioned a detainee's release on cooperation with an interview, the detention would be a violation of the Fourth Amendment.  319 F.3d at 1120–22.  It is far from clear that the officers placed any such conditions on Sikkema's detention, but defendants stretch precedent too far.  Accordingly, there is a material dispute of fact as to whether Sikkema went willingly to the Field Operations Bureau, and whether such action violated his Fourth Amendment rights.

United States District Court

For the Northern District of California

1    Plaintiffs also contend that even for those plaintiffs who voluntarily gave statements or

2  went with the officers, the totality of the circumstances shows that their consent could not have

3  been valid.  Plaintiffs cite *Ganwich v. Knapp*, 319 F.3d at 1120–22, in which police officers

4  detained employees during a search, and explicitly conditioned their release on submitting to

5  individual police interviews.  The Ninth Circuit held that such detention violated the *Ganwich*

6  plaintiffs' Fourth Amendment rights.  Here, however, there is no indication that plaintiffs'

7  release was explicitly conditioned on cooperating with the officers.  That theory of coercion

8  makes even less sense here, where plaintiffs were returned to the house several hours before the

9  search was completed.  Plaintiffs cite another decision, *Bettin v. Maricopa County*, 2007 WL

10 1713319, *7–*10 (D. Ariz. June 12, 2007) (Aspey, J.), in which a criminal suspect's Fourth

11 Amendment rights were violated when she was coerced to submit to interrogation for purposes

12 unrelated to the detention for the search.  The plaintiff was advised she was under investigative

13 detention.  Here, plaintiffs knew they were not suspects in a crime.

14    In sum, viewing the evidence in the light most favorable to the plaintiffs, there remains a

15 triable issue of fact as to whether Michael Sikkema went willingly with defendants to the Field

16 Operations Bureau.  Defendants' motion for summary judgment is **DENIED** as to that narrow

17 issue.  As to all other alleged violations of plaintiffs' constitutional rights, this order finds that

18 there are no triable issues of fact remaining, thus defendants' motion for summary judgment is

19 **GRANTED IN PART AND DENIED IN PART**.

20    **2.    QUALIFIED IMMUNITY.**

21    The threshold question in deciding whether officials are entitled to qualified immunity is

22 whether, taken in the light most favorable to the party asserting injury, the facts show that the

23 officer's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If a

24 violation is established, then the court must ask whether the law forming the basis of the

25 violation was clearly established.  *Ibid*.  "The relevant, dispositive inquiry in determining

26 whether a right is clearly established is whether it would be clear to a reasonable officer that his

27 conduct was unlawful in the situation he confronted."  *Id*. at 208.  "If the law did not put the

28 officer on notice that his conduct was unlawful, summary judgment based on qualified

United States District Court

For the Northern District of California

1   immunity is appropriate." *Id*. at 202.  Finally, the officers are still entitled to summary

2   judgment if they had a reasonable, though mistaken, view of either the law or the facts.  *Id*. at

3   1213.

4          Here, this order has established that there are no triable issues of fact remaining as to

5   whether plaintiffs' Fourth Amendment rights were violated when defendants entered the Curiel

6   house without a warrant.  Still, it is worth noting that defendants relied on the advice of counsel

7   in conducting that warrantless entry of the Curiel house.  Provided officers behave reasonably,

8   consulting with an attorney or legal expert before taking action militates in favor of qualified

9   immunity.  *See Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 888 (9th Cir.

10  1990).  Here, Pate and Barnes consulted deputy district attorney Clark in making the decision to

11  freeze the Curiel house before a warrant issued.  Clark gave them advice and told them that the

12  warrantless entry was permitted under the circumstances.  Furthermore, a judge later upheld the

13  finding of probable cause when issuing a warrant.

14         Plaintiffs also make much of two mistakes of fact made by defendants.  First, the

15  officers did not make certain that Dyleski was actually at the Curiel house at the time it was

16  searched, and Dyleski was not there at the time.  Given that defendants had learned that Dyleski

17  lived at the Curiel house with his mother, it was reasonable for them to go there to look for him

18  as well as for evidence connected to the crimes.  Indeed, it is hard to say exactly how

19  defendants could have made certain that Dyleski would be at the house without alerting him to

20  their presence, potentially causing him to flee.  Additionally, they were provided with no other

21  address where he could be until they spoke with plaintiffs that evening.  Second, the people

22  defendants saw running toward the back of the house were actually small young girls.

23  Although defendants may have been able to see through the windows, defendants could not tell

24  precisely who was running through the house.  Accordingly, it was reasonable under the

25  circumstances for the officers to conclude that waiting for the occupants to open the door was

26  futile and that they had been detected.

27         This order has determined that, viewing the evidence in the light most favorable to

28  plaintiffs, Sikkema's Fourth Amendment rights were violated when the officers took him in for

United States District Court

For the Northern District of California

1  questioning at the Field Operations Bureau.  Defendants contend that the law forming the basis

2  of the violation was not clearly established in view of *Muehler v. Mena*, 544 U.S. 93, 100–01

3  (2005).  Specifically, defendants argue that a reasonable officer would not have thought that

4  ordering a lawfully detained person to go to a station house would not be any more intrusive or

5  coercive than questioning them in a home.  Here, it would seem that transporting someone to a

6  station house against their will is entirely a different matter than questioning them in their

7  home.  Even though Sikkema was not a suspect, the officers effectively upped the ante by

8  transporting him out of his home against his will.  Accordingly, qualified immunity is not

9  appropriate on this issue.  Defendants' motion for summary judgment is **GRANTED IN PART**

10  **AND DENIED IN PART**.

11        **3.     *MONELL* CLAIMS.**

12        Municipalities and local governments can be sued directly for violations of

13  constitutional rights under 42 U.S.C. 1983 where government officials were acting pursuant to

14  an official policy or recognized custom.  *Monell v. Dept. of Social Serv. of New York*, 436 U.S.

15  658, 690 (1978).  The plaintiff must identify the policy or custom which caused the violation.

16  "The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was

17  the 'moving force' behind the conduct alleged.  That is, a plaintiff must show that the municipal

18  action was taken with the requisite degree of culpability and must demonstrate a direct causal

19  link between the municipal action and the deprivation of federal rights."  *Bd. of County*

20  *Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

21        Defendants argue only that there was no violation of plaintiffs' constitutional rights on

22  which a *Monell* claim could be based, reserving any other arguments for a later motion if

23  necessary.  Neither party addressed the issue of custom or policy. This order has granted

24  summary judgment as to all of plaintiffs' alleged Fourth Amendment violations except the

25  transport of Sikkema to the station house, thus that alleged violation could still form the basis of

26  a *Monell* claim.  Accordingly, defendants' motion for summary judgment as to the *Monell* claim

27  is **GRANTED IN PART AND DENIED IN PART**.

28

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4. RUPF IN HIS INDIVIDUAL CAPACITY.

Defendants argue that all claims against Contra Costa County Sheriff Mark Rupf in his individual capacity must be dismissed for plaintiffs' failure to present any evidence of his involvement in the seizure or search at issue here.  "Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivation of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others.  *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (internal quotations and citations omitted).  Summary judgment is appropriate when plaintiffs have presented no evidence of such involvement in constitutional deprivations by defendants.  *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005).  Plaintiffs have come forward with no evidence or theory of how Rupf was involved in the search or seizure. Accordingly, defendants' motion for summary judgment as to this claim is **GRANTED**.  This order need not reach the issue of whether Rupf is entitled to immunity as a state official under the Eleventh Amendment.

### 5. STATE-LAW CLAIMS.

Plaintiffs also bring state-law claims for trespass, false imprisonment, assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and violation of California Civil Code § 52.1 against defendants.  Defendants move for summary judgment arguing that plaintiffs have failed to show triable issues of fact and that these claims are barred by immunities afforded by the California's Government Tort Liability Act.

### A. Immunity Under California Government Code § 821.6.

Defendants contend that they are immune from state-law liability.  "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."  Cal. Gov. Code § 821.6.

Two other code sections govern the scope of public officers' liability for common-law torts under California law.  *First*, California Government Code § 815.2(a) provides:

> A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.

*Second*, California Government Code § 820(a) provides that "[e]xcept as otherwise provided by statute . . . a public employee is liable for injury caused by his act or omission to the same extent as a private person." Accordingly, the California Court of Appeal has explained that this statutory framework establishes two principles:

> (1) unless they are granted specific statutory immunity, a public entity and its employees are liable in tort for the same causes of action that could be brought against a private person; and (2) absent a statute specifically imposing liability, a public entity and its employees are not liable for causes of action in tort that could not be pursued against a private party.

*Lueter v. California*, 94 Cal. App. 4th 1285, 1300 (2002). Furthermore, "California law denies immunity to police officers who use excessive force in arresting a suspect." *Robinson v. Solano County*, 278 F.3d 1007, 1016 (9th Cir. 2002) (en banc). Immunity also does not extend to false arrest and false imprisonment claims. Cal. Gov. Code § 820.4; *Asgari v. City of Los Angeles*, 15 Cal. 4th 744, 752 (1997).

Accordingly, defendants' contention that plaintiffs are immune from suit for false arrest and other torts flowing therefrom is incorrect. To the extent that plaintiffs' emotional distress claims are based on false arrest they survive. The immunity does, however, apply to emotional distress claims arising out of criminal investigations and prosecutions. *Amylou R. v. County of Riverside*, 28 Cal. App. 4th 1205, 1209–10 (1994). Thus, defendants' motion for summary judgment is **GRANTED** as to plaintiffs' claims for intentional infliction of emotional distress and negligent infliction of emotional distress to the extent they are based on defendants' investigative activities.

### B.       False Arrest, Assault and Battery Claims.

If an arrest or imprisonment is privileged by law, the person affecting the arrest or imprisonment is not liable for false arrest or imprisonment. *See Asgari*, 15 Cal. 4th at 757. To prevail on a claim for battery against a police officer, the plaintiff must establish that the officer used excessive force against him or her. *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273

United States District Court

For the Northern District of California

1   (1998).  California law uses the same standard of reasonableness as is used under the Fourth

2   Amendment.  *See Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999).  Because this

3   order has already found that entry into the Curiel house was privileged under law, and that the

4   degree of force used by the officers was reasonable, there are no triable issues of fact left in

5   these state-law claims.  Accordingly, defendants' motion for summary judgment is **GRANTED** as

6   to plaintiffs' claims for assault, battery and false imprisonment.  These claims must be

7   dismissed.

8                              **C.      California Civil Code § 52.1.**

9          California Civil Code § 52.1 prohibits interference with the exercise and enjoyment

10  rights secured by the federal government.  Plaintiffs allege that defendants violated their rights

11  under the Fourth Amendment, however, defendants have shown that there are no triable issues

12  of fact as to those claims, except as to Sikkema.  Accordingly, all other plaintiffs cannot

13  maintain a claim under § 52.1 because they cannot show that their federal constitutional rights

14  were violated.  Sikkema's claim still survives to the extent that it is based on his transport to the

15  Field Operations Bureau.  Defendants' motion for summary judgment is **GRANTED IN PART**

16  **AND DENIED IN PART** for plaintiffs' claim under § 52.1.

17                                      **CONCLUSION**

18         For all the above-stated reasons, defendants' motion for summary judgment as to

19  plaintiffs' claims for violation of 42 U.S.C. 1983, assault, battery, false imprisonment,

20  intentional infliction of emotional distress, negligent infliction of emotional distress, and

21  violation of California Civil Code § 52.1 is **GRANTED IN PART AND DENIED IN PART**.

22

23         **IT IS SO ORDERED.**

24

25  Dated:  August 13, 2007.

    _____
    WILLIAM ALSUP
    UNITED STATES DISTRICT JUDGE

26

27

28